IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |   | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. 2:21-cr-20102-JTF | |
| | ) | | |
| ALEXANDRIA GARNER, | ) | | |
| | ) | | |
| Defendant. | ) | | |

REPORT AND RECOMMENDATION
ON MOTION TO DISMISS OR SUPPRESS EVIDENCE

Before the Court is Defendant Alexandria Garner's Motion to Dismiss and/or Suppress Evidence Pursuant to 18 U.S.C.A. § 1385 (the "Motion"), filed February 16, 2022. (ECF No. 42.) On February 18, 2022, District Judge John T. Fowlkes, Jr., referred the Motion to the undersigned for report and recommendation. (ECF No. 43.) The United States responded in opposition on March 16, 2022. (ECF No. 52.)

The Court held a hearing on the Motion on March 22, 2022. (ECF No. 53.) At the hearing, the United States called two witnesses, Shawn Nash and Dennis Brunson, and introduced into evidence one exhibit: a disc containing video footage from August 1, 2018. Garner did not call any witnesses and introduced one exhibit: a search warrant.

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this Court recommends the Motion be denied.

**PROPOSED FINDINGS OF FACT**

The following proposed facts are taken from the sworn testimony presented at the suppression hearing.  Where factual conflicts were presented, these facts represent the undersigned's resolution of those conflicts after considering the credibility of the witnesses and supporting evidence.

This case began as an investigation by Naval Criminal Investigative Service ("NCIS") agents in June of 2018.  (Tr. 6, 7.)  At the time, NCIS Special Agent Shawn Nash was stationed at the Naval Support Activity Mid-South—the Navy base in Millington, Tennessee—working general crimes cases, including drug investigations.  (*Id.* at 7.)  NCIS received information that an individual who worked on the base had been selling marijuana to other individuals either living or working on base.  (*Id.* at 8.)  That individual subsequently confessed to selling marijuana on base, and NCIS located marijuana in the individual's vehicle parked on base.  (*Id.* at 8–9.)  NCIS investigated the source of that marijuana and identified Garner as a supplier.  (*Id.* at 9, 39.)  Garner was not military personnel and did not work on the base; she worked at a Mapco.  (*Id.* at 56.)

NCIS then contacted officers at the Millington Police Department ("Millington PD") and told them Garner was selling marijuana to an individual on the base.  (*Id.* at 9.)  The Millington PD officers decided to investigate Garner, with NCIS assistance.  (*Id.* at 10.)  NCIS's original on-base target agreed to cooperate and participated in multiple controlled purchases of marijuana from Garner.  (*Id.* at 10.)  The cooperator eventually brought along an undercover Millington PD officer who was introduced to Garner, and that undercover officer then made what was the fifth controlled purchase from Garner.  (*Id.* at 10, 39–40.)  NCIS provided the audio/video equipment to record the controlled purchases, which Millington PD did not have, and the money used in the

2

transactions. (*Id.* at 24, 40.) NCIS agents were involved in each controlled purchase operation and were present at the Millington PD precinct before the purchases. (*Id.* at 24, 26, 32–33, 49–50.)

Video of one of the controlled purchases was admitted as Exhibit 1 at the hearing. (*Id.* at 41.) The video shows Special Agents Nash and Heflin, Millington PD officer Courtney Booker, the cooperator, and the undercover Millington PD officer walking to the cooperator's car and preparing to leave. (*Id.* at 42–43.) The undercover officer held the camera, which was imbedded in a key fob—"[y]ou just open your hand and point it at what you want to video." (*Id.* at 43–44.) The officer and the cooperator drove to Garner's home, and the video shows Garner weigh out a portion of marijuana and sell it to the undercover officer and the cooperator. (*Id.* at 44–45.) Sergeant Dennis Brunson, at the time a detective employed by Millington PD, testified that he and the rest of the team surveilled the cooperator and the undercover officer throughout the operation, and then they all returned to the Millington PD precinct. (*Id.* at 37–38, 45.)

Special Agent Nash photographed the marijuana obtained from the controlled purchase for his reports. (*Id.* at 28.) He could not remember if Millington PD kept custody of the purchased marijuana. (*Id.* at 27.) He probably ran Garner through multiple federal databases to determine her criminal history, which is a normal practice for any case file he opens. (*Id.* at 29.)

Millington PD officers obtained a search warrant for Garner's residence and executed that warrant with NCIS assistance. (*Id.* at 11.) NCIS did not assist in drafting the warrant application. (*Id.* at 30.) Sergeant Brunson testified, however, that the probable cause presented in the search warrant, which was admitted as Exhibit 2, was limited to the five controlled purchases from Garner, all of which involved NCIS agents along with Millington PD. (*Id.* at 51–55.)

Present for the search were two NCIS agents, someone from the West Tennessee Drug Task Force, and at least three Millington PD officers. (*Id.* at 11–12, 46.) NCIS agents helped with the search; Special Agent Nash looked after Garner's dogs and watched other individuals at the residence during the search. (*Id.* at 11.) Millington PD officers seized more than two pounds of marijuana and two guns during the search. (*Id.* at 12, 46.) Millington PD officers and NCIS agents conducted interviews, and Millington PD—not NCIS—arrested Garner and submitted her case for prosecution. (*Id.* at 12, 30, 47.)

NCIS's job is to enforce the law and the rules and regulations on the base—to protect the base and deal with Department of Defense issues that occur on the base. (*Id.* at 14.) The Millington base is geographically large and is probably Millington's largest employer. (*Id.* at 15.) NCIS works with "a lot of the state and local agencies in the area" and "regularly" works with Millington PD. (*Id.* at 9, 59.) In fact, NCIS works with Millington PD on a weekly basis, sometimes on cases involving civilians. (*Id.* at 16–17, 38.) Millington PD works with other law enforcement agencies as well, including Shelby County and the West Tennessee Drug Task Force. (*Id.* at 56.) NCIS agents are civilian federal agents, not military members. (*Id.* at 35.)

In deciding whether to pursue cases involving civilians, NCIS agents consult with their supervisors to determine whether the case has a "Navy nexus"—whether "something outside the base . . . is affecting the base itself." (*Id.* at 17–18.) NCIS can provide money and equipment to smaller law enforcement agencies that may not have those resources. (*Id.* at 19–20.) In a typical case, NCIS would bring information to a local agency, and the agency would decide whether to go forward with the investigation. (*Id.* at 22.)

Because he worked with Millington PD so frequently, Special Agent Nash did not remember in this particular case if Millington PD asked NCIS to participate in the investigation

or if NCIS offered. (*Id.* at 34.) As Sergeant Brunson testified, "[w]e coordinated together, you know, because Ms. Garner affected the navy base as long as—also with affecting the public around. So we just utilized—we just worked together." (*Id.* at 59.) Typically, when Millington PD was interested in pursuing information provided by NCIS, NCIS would stay involved in the investigation. (*Id.* at 34–35, 59.)

Special Agent Nash testified that the Navy nexus in this case was the indication that Garner was selling marijuana to at least one person on base. (*Id.* at 19.) He was not aware of Garner ever making a drug sale on the base or even setting foot on the base. (*Id.* at 20.) To his knowledge, Garner only sold drugs from her home in Millington—off base—to someone who subsequently took the drugs on base and/or sold them to base employees.[1] (*Id.* at 20–21.)

## PROPOSED CONCLUSIONS OF LAW

Garner asserts that NCIS's participation in the investigation into her activities violates the Posse Comitatus Act (the "PCA"), 18 U.S.C. § 1385. The PCA does not, however, govern the conduct of the NCIS agents in this case. Even if it did, the NCIS agents did not violate the PCA, and, in any event, neither suppression nor dismissal is a remedy for any such violation. It is therefore recommended that Garner's motion be denied.

**I.     Applicability of the PCA**

The PCA's purpose "is to prevent use of the federal army to aid civil authorities in the enforcement of civilian laws." *Gilbert v. United States*, 165 F.3d 470, 472 (6th Cir. 1999) (citations omitted) (explaining that the PCA "reflects a concern, which antedates the Revolution,

---

[1] Special Agent Nash clarified that those naval employees could be either civilian or military. (*Id.* at 21.)

about the dangers to individual freedom and liberty posed by use of a standing army to keep civil peace"). At the time of the underlying incidents in this case, the PCA provided:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385 (2018) (amended 2021).[2] Though, in 2018, the PCA explicitly applied only to the Army and the Air Force, in a separate statute Congress directed the Secretary of Defense to

> prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.

10 U.S.C. § 275. The Department of Defense ("DoD") and the Secretary of the Navy have proceeded accordingly, applying "PCA-like restrictions" to the Navy. *See United States v. Chon*, 210 F.3d 990, 993 (9th Cir. 2000) (relying on Department of Defense Directive 5525.5(C) and Secretary of Navy policy SECNAVINST 5820.7B).

Since *Chon*, the regulatory landscape has evolved.[3] Department of Defense Instruction ("DoDI") 3025.21, titled Defense support of Civilian Law Enforcement Agencies, generally

---

[2] The PCA was amended on December 27, 2021, to replace "the Army or the Air Force" with "the Army, the Navy, the Marine Corps, the Air Force, or the Space Force." National Defense Authorization Act for Fiscal Year 2022, Pub. L. No. 117-81, § 1045, 135 Stat. 1541, 1904 (2021). The version of the PCA in place in 2018, however, governs the inquiry in this case. *See, e.g., Johnson v. United States*, 529 U.S. 694, 701 (2000) ("The *Ex Post Facto* Clause raises to the constitutional level one of the most basic presumptions of our law: legislation, especially of the criminal sort, is not to be applied retroactively. . . . Absent a clear statement of [Congressional] intent, we do not give retroactive effect to statutes burdening private interests.") (citations omitted). Neither party has argued that the new version of the statute applies.
[3] Though the DoD had once issued regulations governing "defense support of civilian law enforcement agencies," it removed them prior to the events in this case, as those regulations "neither confer[red] a benefit not otherwise provided for in statute nor impose[d] a burden on civilian law enforcement agencies." Defense Support of Civilian Law Enforcement Agencies, 83

6

governs "DoD support to Federal, State, tribal, and local civilian law enforcement agencies." DoDI 3025.21, § 1(a) (Feb. 27, 2013).[4] It references the PCA as the "primary restriction on DoD participation in civilian law enforcement activities." *Id.* at encl. 3, § 1(a)(1). It provides that "[a]ctions taken for the primary purpose of furthering a DoD . . . function of the United States, regardless of incidental benefits to civil authorities," are not prohibited, so long as those actions do not "serv[e] as a subterfuge to avoid the restrictions of the Posse Comitatus Act." *Id.* at encl. 3, § 1(b)(1). Examples of permissible direct assistance, also described as "active participation in direct law-enforcement-type activities (e.g., search, seizure, and arrest)," include "[i]nvestigations and other actions related to a commander's inherent authority to maintain law and order on a DoD installation or facility" and "[p]rotection of DoD personnel, equipment, and official guests." *Id.*[5] It also expressly does not prohibit certain "indirect assistance," such as the "[t]ransfer to Federal, State, or local law enforcement officials of information acquired in the

---

Fed. Reg. 14,588-01 (Apr. 5, 2018) (reserving 32 C.F.R. pt. 182). "DoD internal guidance concerning defense support of civilian law enforcement agencies will continue to be published in DoD Instruction 3025.21 . . . ." *Id.*

[4] The version of DoDI 3025.21 in place at the time of the events of this case is available at https://www.hsdl.org/?abstract&did=732255. The portions of DoDI 3025.21 quoted herein are unchanged in the current version of the instruction, effective since February 8, 2019, found at https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/302521p.pdf.

[5] DoDI 3025.21 states that it does not apply to "[c]ounternarcotics activities," with no further explanation or definition. *Id.* § 2(f)(1). In related guidance, however, DoDI 3025.18, "Defense Support of Civil Authorities," similarly disclaims applicability to "[c]ounternarcotics operations conducted under the authority of section 284 of Reference (d)." That reference is to 10 U.S.C. § 284, "Support for counterdrug activities and activities to counter transnational organized crime." DoDI 3025.18, encl. 1, ref. (d). That statute provides that "[s]upport under this section shall be subject to the provisions of section 275." The exception as to "counternarcotics activities" in DoDI 3025.21 thus appears to be a reference to 10 U.S.C. § 284, which is explicitly subject to 10 U.S.C. § 275. Any "counternarcotics activities" permissible under DoDI 3025.21 therefore cannot exceed the bounds of the PCA-like restrictions Congress directed the DoD to impose upon itself.

normal course of DoD operations that may be relevant to a violation of any Federal or State laws." *Id.* at encl. 3, § 1(g).

These provisions of section 1 of DoDI 3025.21's enclosure 3 do not, however, apply to the NCIS. Section 2 of enclosure 3 provides that section 1's restrictions on participation in civilian law enforcement activities "do not apply to . . . [a] civilian employee." *Id.* at encl. 3, § 2(c). "If the civilian employee is under the direct control of a military officer, assistance will not be provided unless it is permitted by section 3 of this enclosure," with section 3 describing the types of approval required for participation where "the suspected criminal activity poses a serious threat to the interests of the United States" or "to prevent loss of life or wanton destruction of property" where civilian law enforcement is unavailable. *Id.* at encl. 3, §§ 2(c), 3. Section 3 does not apply to NCIS agents either, however, as NCIS agents are not under the direct control of a military officer: the United States maintains that NCIS agents are "federal law enforcement officers who are civilian employees of the Navy. They are not military personnel. NCIS agents report to civilians, not military commanders." (ECF No. 52, at 4.) Thus, the PCA-like requirements of section 1 of DoDI 3025.21 do not apply to NCIS agents.

Other courts have found differently. In *Chon*, the Ninth Circuit interpreted predecessor instructions to DoDI 3025.21 and found that

> the PCA and PCA-like restrictions function to proscribe use of the strength and authority of the military rather than use of the private force of the individuals who make up the institution. In other words, while DoD personnel may participate in civilian law enforcement activities in their private capacities, they may not do so under the auspices of the military.

210 F.3d at 993 (citing SECNAVINST 5820.7B; DoD Directive 5525.5(B)). Though the court acknowledged the NCIS "is headed by a civilian directed with a civilian chain of command," "the NCIS Director has a direct reporting relationship to the Chief of Naval Operations, a

8

military officer," and thus "the NCIS continues to be a unit of, and accountable to, the Navy." *Id.* at 994. More generally, the court found that "civilian NCIS agents represented and furthered the interests of the Navy, and were delegated the same authority to do so as military NCIS agents. When the civilian world is confronted by agents of the Navy, it is unlikely to make the fine distinctions asserted by the government between military and civilian NCIS agents." *Id.* at 993. In *United States v. Dreyer*, the Ninth Circuit adopted its reasoning from *Chon* without mention of DoDI 3025.21 (which was issued in 2013)[6] or its exemption for civilian employees. 804 F.3d 1266, 1274 (9th Cir. 2015).

Based on this Court's review, DoDI 3025.21 provides that its PCA-like restrictions do not apply to civilian employees. The proof in this case is that NCIS agents are civilian employees who report to civilians. Thus, DoDI 3025.21's civilian exemption governs, and the NCIS agents are not subject to PCA-like restrictions.

A DoDI instruction that is applicable to NCIS is DoDI 5505.03, "Initiation of Investigations by Defense Criminal Investigative Organizations" (or DCIOs), with DCIO defined to include NCIS. DoDI 5505.03, Glossary.[7] DoDI 5505.03 first provides that "it is DoD policy that DCIOs shall initiate investigations in accordance with law and governing regulations, but do not require approval from any authority outside of the DCIO." DoDI 5505.03 § 4(a). The instruction requires that "DCIOs will identify a DoD nexus before making a determination to initiate any criminal investigation or operation." *Id.* § 4(d). "A DoD nexus" is established based on a "reasonable likelihood of," for example, a crime occurring on a DoD installation or a DoD

---

[6] The events at issue in *Dreyer* occurred in 2011, which may explain the *Dreyer* court's omission of DoDI 3025.21.

[7] DoDI 5505.03, adopted March 24, 2011, and amended February 13, 2017, is available at https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/550503p.pdf?ver=2019-08-13-083329-373.

employee being a victim of a crime or the target of the investigation. *Id.*[8] This instruction is consistent with Special Agent Nash's testimony that he was required to find a "Navy nexus" before pursuing a case involving a civilian.

## II.     Whether the NCIS Improperly Participated in the Investigation in This Case

NCIS's involvement in this case was not improper. As discussed above, the NCIS agents were not bound by the Navy's PCA-like restrictions in place at the time and were only required to identify a "Navy nexus" to participate in the investigation of Garner. The agents had information that Garner was selling narcotics to a base employee who then sold those narcotics on base. That nexus satisfies the low bar set by DoDI 5505.03 of a reasonable likelihood that a crime occurred on a DoD installation or a DoD employee was a victim of a crime or the target of the investigation. The agents therefore acted within the authority granted by DoDI 5505.03 in participating in the investigation of Garner.

Even if the NCIS agents were subject to PCA restrictions, however, their conduct would still be permissible. Though binding precedent is lacking as to this factual scenario, other courts have held that military personnel who coordinate with local law enforcement do not necessarily violate the PCA. "In civilian prosecutions stemming from joint military-civilian investigations into off-base drug sales, courts have interpreted [regulations implementing the PCA] to require the government to demonstrate a military purpose—that is a nexus between the targeted off-base sales and military personnel; this purpose must be shown to have been the primary purpose of the military's participation." *Fox v. State*, 908 P.2d 1053, 1057 (Alaska Ct. App. 1996). In *Fox*, the "clear military purpose" identified by the court was a soldier who had tested positive for

---

[8] "[R]easonable likelihood [d]enotes a standard that is less than the 'more likely than not' standard, but more than merely a remote, outlandish, or simply hypothetical possibility." DoDI 5505.03, Glossary, pt. II.

narcotics, with the Army investigators then focusing on his source of supply—an off-base civilian who "sold primarily to military personnel." *Id.*; *see also Moon v. State*, 785 P.2d 45, 48 (Alaska Ct. App. 1990) (finding no PCA violation where "the investigation was not begun until the military was satisfied that drug dealers at the Palace Hotel had targeted military personnel as a market"). The Army investigator asked local police if they would be willing to pursue the civilian drug source, and the police requested the Army investigator's assistance. 908 P.2d at 1055–56. The Army investigator then conducted a series of controlled purchases from the source, surveilled by the police and other Army investigators, with the police taking custody of the drugs and testing them. Though the police "conditioned [their] willingness to investigate on the military's willingness to assist," the court found a "reasonable inference" that the Army investigators were "motivated by a legitimate military interest" and thus did not violate the PCA. *Id.* at 1058.

Unlike in *Fox*, there is no evidence in this case that Garner was selling drugs primarily to military personnel. Other courts, however, have not required such targeting of the military to nonetheless find a sufficient military nexus when drugs are sold to military personnel. *See, e.g.*, *Hayes v. Hawes*, 921 F.2d 100 (7th Cir. 1990) (finding no PCA violation where military officials participated in an investigation into an off-base location where a sailor had purchased cocaine); *McPherson v. State*, 800 P.2d 928, 929 (Alaska Ct. App. 1990) (finding "a valid military purpose in investigating drug transactions at Jack's Arcade when there was evidence that military personnel had participated in transactions there"); *People v. Wells*, 221 Cal. Rptr. 273, 273 (Cal. Ct. App. 1985) (finding no PCA violation in a Navy investigation "with the goal of taking illegal drug dealers off the streets of the City of Oceanside and thus minimizing the flow of drugs into nearby Camp Pendleton"); *State v. Maxwell*, 328 S.E.2d 506, 507 (W. Va. 1985) (finding no

11

PCA violation in a Navy investigation into an off-base tavern "in the business of selling drugs," identified by Navy agents during their investigation into "drugs being sold to Navy personnel").

In this case, the NCIS agents identified a Navy nexus in the Garner investigation—they had information she was selling drugs to a base employee who was reselling those drugs to others on base. Though Garner may not have targeted Navy employees or even known that she was selling to a Navy employee, the connection between the investigation and the Navy need not be so close. The NCIS agents identified Garner as the direct supplier of drugs to a Navy employee; that nexus is sufficient for purpose of the PCA.

In assessing whether a PCA violation has occurred, some courts also look to how the coordination begins, finding that, when military personnel contact police, rather than the local police "summoning" the military, the military does not violate the PCA. *See, e.g.*, *Maxwell*, 328 S.E.2d at 509 ("[T]he Navy had an ongoing investigation and merely coordinated its efforts with those of the West Virginia State Police. West Virginia authorities did not summon the military agents' assistance. Instead the Navy contacted the West Virginia police. The fact that the Navy's internal investigation happened to uncover wrongs by civilians does not bring the case within the scope of 18 U.S.C. § 1385 . . . ."); *see also State v. Gunter*, 902 S.W.2d 172, 175 (Tex. Ct. App. 1995) (finding no PCA violation where the military investigation was neither initiated by local police nor conducted at their request, and the police became involved only at the request of the military); *State v. Hayes*, 404 S.E.2d 12, 14 (N.C. Ct. App. 1991) ("[T]his case does not involve a civilian agency asking for military assistance. The military called the civilian agency to handle those matters which only it could."); *Wells*, 221 Cal. Rptr. at 275 (noting that the Navy agents initiated the investigation); *Hubert v. State*, 504 P.2d 1245, 1246 (Okla. Crim. App. 1972) ("Lawton law enforcement authorities did not summon the military agents' assistance.").

Here, it is undisputed that the investigation into Garner started with the NCIS agents, who then brought their information to Millington PD. Though Special Agent Nash could not recall whether he offered to stay involved, or whether Millington PD asked him to, that fact is not determinative. This case does not involve local law enforcement summoning the military for assistance; instead, the NCIS handed their investigation of Garner to Millington PD, after which NCIS assisted and remained involved.

Another focus in the PCA inquiry is the extent of the military's participation in the civilian investigation, with some courts finding only "excessive military involvement . . . fall[ing] within the proscriptions of the statute." *Hawes*, 921 F.2d at 104. In *Hawes*, the NIS (the predecessor agency to the NCIS) received information regarding the off-base location where a sailor had purchased cocaine. The NIS agent contacted local law enforcement, and they agreed to work together to place the location under surveillance. The NIS agent made a controlled purchase from the defendant, after which he signaled the police officers, who arrested and searched the defendant. The court found the NIS agent's participation was "not sufficiently pervasive to rise to the level of enforcement of the law by the Navy." *Id.* at 104. Though he shared information, aided in surveillance, made the undercover buy, and signaled to police, he did not make the arrest, conduct the search, seize the evidence, or transport it for testing. As such, his "activities were much like those of an undercover civilian cooperating with the police in a controlled drug transaction." *Id.* at 103; *see also Wells*, 221 Cal. Rptr. at 275 (finding no PCA violation where Navy agents participated "as undercover informants only, not as officers arresting civilians"); *Hubert*, 504 P.2d at 1246–47 (finding no PCA violation where military investigators purchased marijuana from a soldier's off-base source of supply and handed the narcotics off to police, as "[t]he soldier led the agents to a location outside the scope of their

13

military jurisdiction, at which time the agents assumed no greater authority than that of a private citizen").

Similarly, in *Wright v. State*, 749 S.W.2d 935 (Tex. Ct. App. 1988), military police learned that a civilian was selling narcotics to military personnel. The military officers contacted local police, and together they planned a controlled purchase. The purchase was conducted by a military officer, who then signaled police to arrest the defendant. The court held that, "by contacting the local police and informing them of appellant's unlawful drug dealing, and in coordinating their subsequent investigation with civilian law enforcement officers, who actually arrested appellant, the military police did not violate the Posse Comitatus Act or the related statutes and regulations." *Id.* at 939.

As in *Hawes* and *Wright*, this case does not involve excessive NCIS involvement that rises to the level of law enforcement by the military. Once the NCIS agents shared their information on Garner with Millington PD, the investigation continued as a Millington PD operation, with NCIS assistance. The NCIS cooperator and an undercover Millington PD officer made the controlled purchases from Garner. NCIS provided the equipment to record, and the money to fund, the transactions. Both Millington PD officers and NCIS agents were involved in preparations for each purchase. Millington PD officers obtained the search warrant for Garner's home, which was conducted by Millington PD officers with assistance from two NCIS agents. Millington PD officers seized the guns and marijuana from Garner's home, and Millington PD officers arrested Garner. Though NCIS agents participated in every step of the investigation, they did not lead the case or take custody of Garner or her property. The NCIS involvement may have been pervasive in this case, but not sufficiently pervasive to constitute enforcement of the law by the Navy necessary to trigger a PCA violation.

Garner principally relies on *United States v. Dreyer* as "portray[ing] the dangers and violations by the NCIS agents at issue in this case as well." (ECF No. 42, at 4.) In *Dreyer*, however, an NCIS agent began an investigation into the distribution of child pornography on the internet by performing a "statewide audit of all computers engaged in file sharing, . . . knowing the sweep would include countless devices that had no ties to the military." 804 F.3d at 1276. Through that audit, the agent identified the defendant, who had no military affiliation, as associated with an IP address that had shared child pornography. Thus, the agent "spearheaded a law enforcement investigation that would inevitably encompass *mostly* civilian-owned computers," leading the Ninth Circuit to conclude that the investigation did not have "a legitimate independent military purpose." *Id.* In contrast, this case began with an undeniable military purpose—investigating the sale of narcotics on the Navy base in Millington to Navy employees. That investigation led to Garner as the source of those narcotics. Unlike in *Dreyer*, here the connection between the military purpose and the civilian investigation is direct and legitimate, and thus the NCIS agents did not violate the PCA.

The remaining cases cited by Garner are factually distinct and therefore offer little assistance to the inquiry at bar. *See United States v. Griley*, 814 F.2d 967 (4th Cir. 1987) (finding no PCA violation where military investigators worked with the FBI in searching the defendant's on-base home); *Applewhite v. U.S. Air Force*, 995 F.2d 997 (10th Cir. 1993) (finding no PCA violation where military officers conducted an off-base controlled sale of drugs to an airman and his wife); *Hayes*, 404 S.E.2d at 13 (finding no PCA violation where the defendant, who "was in the military," was the source of drug supply to an AWOL soldier); *State v. Poe*, 755 S.W.2d 41, 45 (Tenn. 1988) (involving an investigation where "both the victim and the perpetrators of the crime were on active military duty").

For the foregoing reasons, the NCIS agents' participation in the investigation of Garner did not violate the PCA.

### III. Remedy

Neither of the remedies Garner seeks is available for a PCA violation. The PCA is a criminal statute and provides that punishment for a violation is a fine, a maximum of two years imprisonment, or both. 18 U.S.C. § 1385; *see also United States v. Holloway*, 531 F. App'x 582, 583 (6th Cir. 2013) (per curiam) ("The statute itself provides only for a fine or imprisonment for its violation."). Suppression is not warranted unless the PCA violation is "widespread and repeated"—something that has not been demonstrated in this case. *See, e.g.*, *United States v. Salinas*, 823 F. App'x 259, 260 (5th Cir. 2020) (quoting *United States v. Hartley*, 796 F.2d 112, 115 (5th Cir. 1986)); *United States v. Johnson*, 410 F.3d 137, 149 (4th Cir. 2005) (quoting *United States v. Al-Talib*, 55 F.3d 923, 930 (4th Cir. 1995)) ("[A]s a general matter, the exclusionary rule is not a remedy for violations of the [PCA]."); *see also Gilbert*, 165 F.3d at 474 n.2 (though not reaching the issue, noting that "every federal court to have considered the issue has held that suppression is not an appropriate remedy for a violation of the Act"). Though the witnesses testified about frequent collaboration between NCIS and local law enforcement, no evidence was presented as to whether that collaboration typically reflects the level of involvement NCIS had in this case. Thus, even if Garner could have shown a PCA violation in this instance, she has failed to show that other instances of cooperation between NCIS and local law enforcement were PCA violations and were so frequent as to potentially justify suppression.[9]

---

[9] Given the ruling that no PCA violation occurred in this case, the Court will not address Garner's argument, raised for the first time at the hearing, that exclusion is appropriate because the probable cause set out in the search warrant affidavit "is totally made up of violations of the Posse Comitatus Act" due to the NCIS agents' involvement in each controlled purchase listed in

Nor does the PCA provide for dismissal as a remedy. *See, e,g.*, *United States v. Dong*, 731 F. App'x 180, 182 (4th Cir. 2018) ("By its terms, the remedy for a violation of the PCA is not to dismiss the criminal charges against the offender or reverse his convictions but to hold the transgressor criminally liable.") (citations omitted); *United States v. Vick*, 842 F. Supp. 2d 891, 894 (E.D. Va. 2012) ("[T]here is no authority to support a motion to dismiss an indictment for a violation of the PCA. Defendants have not provided any such authority, and there is nothing on the face of the statute to support the position that a violation warrants dismissal of an indictment."). Because a violation of the PCA should not result in suppression or dismissal in Garner's case, it is recommended that her Motion be denied.

## RECOMMENDATION

For the foregoing reasons, this Court recommends the Motion be denied.

Respectfully submitted this 9th day of May, 2022.

s/Annie T. Christoff<br>
ANNIE T. CHRISTOFF<br>
UNITED STATES MAGISTRATE JUDGE

## NOTICE

Within fourteen (14) days after being served with a copy of this report and recommendation, a party may serve and file written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59 (b)(2). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Failure to file objections within fourteen (14) days may constitute waiver of objections, exceptions, and further appeal.

---

the probable cause section, rendering the search invalid as tainted by the PCA violations. (Tr. 74.)